UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DEWILLA WOODS,

      Plaintiff,

v.                              Civil Action No. 2:17-cv-00256

REVERSE MORTGAGE USA, INC.,
and REVERSE MORTGAGE SOLUTIONS,
INC.,
      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is Reverse Mortgage Solutions, Inc.'s ("RMS")
motion to dismiss, filed February 3, 2017.


I. Factual and Procedural Background


In this action, the plaintiff, Dewilla Woods ("Mrs.
Woods"), alleges that the defendant, RMS, has violated various
West Virginia common and statutory laws in connection with the
origination and servicing of a reverse mortgage transaction
between the parties. A reverse mortgage, or a reverse annuity
mortgage, is "a nonrecourse loan secured by real property
which[] (1) [p]rovides cash advances to a borrower based on the
equity in a borrower's owner-occupied principal residence . . .
[and] (2) [r]equires no payment of principal or interest until
the entire loan becomes due and payable." W. Va. Code § 47-24-3

(2016); see also Reverse Annuity Mortgage, Black's Law Dictionary (10th ed. 2014).

Mrs. Woods is a resident of Kanawha County, West Virginia. Complaint ("Compl.") ¶ 1. RMS, a Texas company doing business in West Virginia, is a real estate investment company specialized in "making and servicing residential real estate mortgage loans." Id. ¶ 9. On July 14, 2012, Mrs. Woods and her late husband, Billy R. Woods ("Mr. Woods"), closed on a reverse mortgage with Reverse Mortgage USA, Inc ("USA") and the Secretary of Housing and Urban Development ("Secretary"). Id. ¶¶ 15, 36; see Defendant's Memorandum in Support ("Mem. in Supp."), Exhibit ("Exh.") B at 1. USA then "transferred both ownership and servicing rights . . . to [RMS]." Id. ¶ 39.

In October, 2016, Mrs. Woods first learned that the reverse mortgage contract included the following closing charges:

a. . . . origination fee of $2,775.00 . . . ;

b. . . . recordation charges and . . . "recording services" fee;

c. . . . "validation" fee;

d. . . . "mobile courier" and "courier" fees;

e. . . . "tax cert fee";

f. . . . fee paid to USA for flood certification;

g. $350.00 "Notary Fee"; [and]

*quote?* h. . . . $550.00 charge for the . . . appraisal, which the Woods had already paid in full.

Id. ¶ 40 (quotations in original). In addition, USA charged the Woods over $7,000 in "settlement charges." Id. ¶ 41.

"[O]nly a few months after the July, 2012[,] closing," Mr. Woods passed away. Id. ¶ 47. Mrs. Woods, "over the next several years," began missing payments on her home's taxes and hazard insurance premiums (together, the "property charges") as those payments became due. Id. ¶ 52. "As a result, RMS force-placed . . . hazard insurance on the home[] and began paying the . . . real estate taxes." Id. ¶ 53.

RMS began calling and writing Mrs. Woods, "demanding full and immediate payment of the insurance and tax charges" under the threat of foreclosure. Id. ¶ 54. Mrs. Woods responded that she was unable to pay RMS "immediately and in full" because her monthly income had been reduced after her husband's passing. Id. ¶ 51, 55. Mrs. Woods requested that she be permitted to subscribe to a monthly payment plan to pay off the amount owed, id. ¶¶ 55-56, but RMS "told Mrs. Woods it would only accept payment in full and that if she did not make full payment, her home would eventually be sold," id. ¶ 59.

On August 1, 2016, RMS sent Mrs. Woods a letter stating that, to avoid foreclosure, Mrs. Woods must pay within 30 days "$73,783.25 and any other payments, late charges or fees that may become due prior to the curing of the default," including "attorney fees and other . . . charges." Id. ¶¶ 64-67. "Mrs. Woods was unable to pay the amount demanded." Id. ¶ 70. RMS foreclosed on the home and scheduled the foreclosure sale for November 1, 2016. Id. ¶ 71.

Mrs. Woods instituted this action on November 1, 2016, in the Circuit Court of Kanawha County. Pertinently, in Counts II and III, Mrs. Woods claims that RMS' efforts at collecting outstanding payments violated the debt collection provisions of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va. Code ch. 46A. In Count IV, Mrs. Woods alleges that the reverse mortgage included fees made unlawful by the WVCCPA; the West Virginia Residential Mortgage Lender, Broker and Servicer Act (the "Residential Mortgage Act"), W. Va. Code ch. 31, art. 17; and the Reverse Mortgage Enabling Act (the "Reverse Mortgage Act"), W. Va. Code ch. 47, art. 24. In Count VII, Mrs. Woods insists that RMS breached "express provisions of the contract, as well as its duty of good faith and fair dealing." Mrs. Woods seeks, inter alia, actual damages, a declaration voiding the reverse mortgage and declaring it unenforceable, injunctive

4

relief requiring RMS to engage in loss mitigation efforts, and civil penalties pursuant to the WVCCPA.

RMS filed an answer on December 30, 2016, and removed the action to this court on January 6, 2017, invoking the court's diversity jurisdiction. On February 3, 2017, RMS moved to dismiss Counts II, III, IV, and VII of the complaint. First, RMS contends that, "[a]s a matter of law, RMS is not a debt collector" within the purview of the WVCCPA. Mem. in Supp. at 4. Second, RMS insists that the Count IV claims are barred by the applicable statute of limitations and that, regardless, the closing charges were permissible under the Residential Mortgage Act. Id. at 7-10. Last, RMS asserts that Mrs. Woods has failed to identify any provision of the reverse mortgage contract that RMS allegedly breached. Id. at 11-12.

On a procedural note, Mrs. Woods points out, and RMS agrees, that because RMS filed its motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) after it filed an answer, the motion is converted to a motion for judgment on the pleadings under Rule 12(c). Plaintiff's Response ("Resp.") at 8-9; Defendant's Reply ("Reply") at 1 n.1; see Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405 (4th Cir. 2002) ("Because [the defendant's] answer had been filed, the pleadings were closed at the time of the motion. Thus, we

construe the [12(b)(6)] motion as one for judgment on the pleadings."). As explained below, the conversion "does not have a practical effect upon [the court's] review." Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).

II. Motion for Judgment on the Pleadings Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Correspondingly, Rule 12(b)(6) provides that a pleading may be dismissed for a "failure to state a claim upon which relief can be granted."

"Rule 12(h)(2) provides that the defense of failure to state a claim upon which relief can be granted as set forth in Rule 12(b)(6) may be raised 'by motion for judgment on the pleadings, or at the trial on the merits.' Therefore, as a matter of motions practice," a Rule 12(b)(6) motion to dismiss filed after the close of pleading "should be viewed as a Rule 12(c) motion for judgment on the pleadings raising the defense of failure to state a claim upon which relief can be granted." Edwards, 178 F.3d at 243 (quoting Fed. R. Civ. P. 12(h)(2)) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367, at 514-15 (2d ed. 1990) and

<u>Republic Steel Corp. v. Penn. Eng'g Corp.</u>, 785 F.2d 174, 182
(7th Cir. 1986)). "However, the distinction is one without a
difference, as . . . [a] district court[] . . . appl[ies] the
same standard for Rule 12(c) motions as for motions made
pursuant to Rule 12(b)(6)." <u>Burbach Broad. Co.</u>, 278 F.3d at 406
(citing <u>Edwards</u>, 178 F.3d at 243 and <u>Pacific Ins. Co. v. Am.
Nat'l Fire Ins. Co.</u>, 148 F.3d 396, 405 (4th Cir. 1998)).

     To survive a motion to dismiss, a pleading must recite
"enough facts to state a claim to relief that is plausible on
its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570
(2007); <u>see also</u> <u>Monroe v. City of Charlottesville</u>, 579 F.3d
380, 386 (4th Cir. 2009) (quoting <u>Giarratano v. Johnson</u>, 521
F.3d 298, 302 (4th Cir. 2008)). In other words, the "[f]actual
allegations must be enough to raise a right to relief above the
speculative level." <u>Twombly</u>, 550 U.S. at 555 (citation
omitted); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)
("A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged."); <u>Andrew v. Clark</u>, 561 F.3d 261, 266 (4th Cir. 2009)
(quoting <u>Twombly</u>, 550 U.S. at 555).

     "In resolving a motion pursuant to Rule 12(b)(6)[,] a
district court cannot consider matters outside the pleadings

without converting the motion into one for summary judgment."

Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013)

(citing Fed. R. Civ. P. 12(d)). "A court may, however, consider

a 'written instrument' attached as an exhibit to a pleading, 'as

well as [documents] attached to the motion to dismiss, so long

as they are integral to the complaint and authentic.'" Id.

(alteration in original) (internal citation omitted) (quoting

Fed. R. Civ. P. 10(c) and Phillips v. Pitt Cty. Mem'l Hosp., 572

F.3d 176, 180 (4th Cir. 2009)); see also 5B Charles Alan Wright

& Arthur R. Miller, Federal Practice and Procedure, § 1357 (3d

ed. 2017) ("Numerous cases . . . have allowed consideration of

matters incorporated by reference or integral to the claim . . .

and exhibits attached to the complaint whose authenticity is

unquestioned . . . ."); cf. Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. 308, 322-23 (2007) (stating that, in the

context of deciding on a motion under 12(b)(6) "whether the

pleaded facts give rise to a 'strong' inference of scienter,"

courts may consider "documents incorporated into the complaint

by reference").

A district court's evaluation of a motion to dismiss

is underlain by two principles. First, when considering a

motion to dismiss, the court "must accept as true all of the

factual allegations contained in the [pleading]." Erickson v.

Pardus, 551 U.S. 89, 94 (2007) (citing Twombly, 550 U.S. at 555-56).  In doing so, factual allegations should be distinguished from "mere conclusory statements," which are not to be regarded as true.  Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  Second, the court must "draw[] all reasonable factual inferences . . . in the [nonmovant's] favor."  Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999); see also Jenkins v. McKeithen, 395 U.S. 411, 421 (1969) ("[T]he complaint is to be liberally construed in favor of plaintiff.").


## III. Discussion


### A. Counts II and III – Violation of the WVCCPA's Debt Collection Provisions


In Counts II and III, Mrs. Woods alleges that RMS pursued debt collection practices made unlawful by the WVCCPA. Compl. ¶¶ 77-78.  Of relevance here, the WVCCPA provides that "[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims," W. Va. Code § 46A-2-127 (2016), and that "[n]o debt collector may use unfair or unconscionable means to collect or attempt to collect any claim," id. § 46A-2-128.  Resolution

of these issues first requires careful review of the statutory definitions of the WVCCPA.

> A "debt collector" is defined as "any person or organization engaging directly or indirectly in debt collection." Id. § 46A-2-122(d).

> The act of "debt collection" is defined as "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer." Id. § 46A-2-122(c).

> And "claims," of which a debt collector collects, are defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or service which is the subject of the transaction is primarily for personal, family or household purposes." Id. § 46A-2-122(b).

For reasons explained below, the court concludes (1) that RMS was a "debt collector" and (2) that the payments it sought to collect from Mrs. Woods were "claims," each within the scope of the WVCCPA. Consequently, RMS' motion for judgment of Counts II and III on the pleadings must be denied.

1.

RMS insists that it is a creditor, not a debt collector, placing it outside the purview of the WVCCPA. Reply at 3-4. RMS notes that the 2015 amendments to the civil remedy provision of the WVCCPA, § 46A-5-101(1), include a cause of action against both creditors and debt collectors, rather than

10

against only creditors as the statute was written before. <u>Id.</u>
at 3-4. <u>Compare</u> § 46A-5-101(1) (2016) ("If a creditor or debt
collector has violated the provisions of this chapter applying
to . . . any prohibited debt collection practice . . . .") <u>with</u>
§ 46A-5-101(1) (1996) ("If a creditor has violated the
provisions of this chapter applying to . . . any prohibited debt
collection practice . . . ."). RMS argues that the West
Virginia Legislature, by including "debt collector," intended to
draw the same distinction between debt collectors and creditors
as drawn by the federal Fair Debt Collection Practices Act
("FDCPA"), 15 U.S.C. § 1692 <u>et seq.</u>, which exempts creditors
from liability for debt collection activities. Reply at 4.

Mrs. Woods responds that RMS was a "debt collector"
within the scope of the statute, asserting that the long-
standing meaning of "debt collector" under the WVCCPA is broad
and includes any party attempting to collect a debt, including
creditors. Resp. at 14-15 (citing <u>Thomas v. Firestone Tire &
Rubber Co.</u>, 164 W. Va. 763, 768-69 (1980) (finding that the
WVVCPA's debt collection provisions "appl[y] alike to all who
engage in debt collection, be they professional debt collectors
or creditors collecting their own debts")).

The court is not persuaded to adopt the construction
advanced by RMS. As the Supreme Court of Appeals of West

Virginia recognized in <u>Firestone Tire</u>, a plain reading of the debt collection provisions of the WVCCPA leads to the conclusion that "any debt collector" includes "creditors collecting their own debts." 164 W. Va. at 759; <u>cf.</u> <u>id.</u> ("The Court is led to the unavoidable conclusion that the word 'any,' when used in a statute, should be construed to mean, in a word, any."); <u>Fleet v. Webber Springs Owners Ass'n, Inc.</u>, 235 W. Va. 184, 192 (2015) (finding that "[t]he plain language . . . is broad enough . . . to include [the defendant] within the definition of the term 'debt collector,'" where the defendant was a creditor collecting on its own debts). <u>See</u> <u>generally</u> Syl. Pt. 5, <u>Leggett v. EQT Prod. Co.</u>, 800 S.E.2d 850, 853 (W. Va. 2017) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." (quoting Syl. Pt. 2, <u>Crockett v. Andrews</u>, 153 W. Va. 714 (1970))). The simple addition of "or debt collector" is insufficient to alter the statute's plain meaning. This conclusion is particularly true in light of the Supreme Court of Appeals' persistent instruction that the WVCCPA "must be liberally construed to accomplish" its remedial purpose of "protect[ing] consumers from unfair, illegal and deceptive business practices." <u>Fleet</u>, 235 W. Va. at 192 (quoting <u>Harper v. Jackson Hewitt, Inc.</u>, 227 W. Va. 142, 151 (2010)).

To the extent that the 2015 amendments create any ambiguity, RMS asks the court to follow the lead of the Supreme Court of Appeals, which RMS insists adopts the federal judiciary's interpretation of the FDCPA when resolving unanswered questions under the WVCCPA. Reply at 4. While RMS is correct that the Supreme Court of Appeals in the past has looked to the FDCPA for assistance, see, e.g., id. at 194, the court does not always follow suit when the language of the two acts differ, see, e.g., Young v. EOSCCA, 800 S.E.2d 224, 229-30 (W. Va. 2017); cf. Ademiluyi v. PennyMac Inv. Trust Holdings I, LLC, 929 F. Supp. 2d 502, 520 (D. Md. 2013) ("The FDCPA was designed to provide basic, overarching rules for debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation.") (quoting Carlson v. First Revenue Assurance, 359 F.3d 1015, 1018 (8th Cir. 2004)).

The nub of RMS' argument lies on the fact that the FDCPA and the WVCCPA have nearly identical prohibitions of debt collection practices and that each refer to only "debt collectors," compare, e.g., 15 U.S.C. §§ 1692e-f (2015), with W. Va. Code §§ 46A-2-127 to 128 (2016), and identical definitions of "debt" and "claim," compare 15 U.S.C. § 1692a(5) (2015) (defining "debt"), with W. Va. Code § 46A-2-122(b) (2016)

13

(defining "claim"). Critically, however, the FDCPA explicitly exempts creditors from debt collection liability. 15 U.S.C. § 1692a(6)(F) (2015). The WVCCPA does not. The only fact lending to an inference of the same exemption under the WVCCPA – and the fact upon which RMS heavily relies - is that the West Virginia Legislature in 2015 added "or debt collector" to the statute's civil liability provisions, dubiously drawing a distinction between creditors and debt collectors.

A few important facts run counter to that assertion. First, "creditor" is not defined by the WVCCPA. The West Virginia Legislature likely did not intend to exempt from liability an undefined portion of the debt collecting population, particularly when the common definition of "creditor" is conspicuously broad. Creditor, Black's Law Dictionary, (10th ed. 2014) (defining "creditor" as "[o]ne to whom a debt is owed").

Second, as noted earlier, the FDCPA specifically exempts creditors from liability for illegal debt collection activities, whereas the WVCCPA does not. In fact, the civil liability section of the WVCCPA cited by RMS indicates that the West Virginia Legislature actually intended to subject creditors to liability for conducting illegal debt collection activities. That section states that "[i]f a creditor or debt collector has

14

violated the provisions of this chapter applying to . . . any prohibited debt collection practice[,] . . . the consumer has a cause of action to recover" damages and a statutory penalty. §46A-5-101(1).

Third, in 2015, an amendment was proposed in the West Virginia House of Delegates that adopted virtually verbatim the FDCPA's creditor exemption. H.D. 2891, 81st Leg., Reg. Sess. (W. Va. 2015), http://www.wvlegislature.gov/Bill_Text_HTML/2015_SESSIONS/RS/Bills/hb2891%20intr.htm. Ultimately, that amendment was rejected, and the amendment cited by RMS prevailed. If the West Virginia Legislature truly intended to carve out an exception for creditors, it had the opportunity to explicitly do so and declined. Accordingly, the court finds that RMS was a debt collector "engag[ed] . . . in debt collection" within the scope of the WVCCPA.

2.

RMS contends that, even if the court finds that it is a debt collector, the tax and insurance charges that it sought to recoup from Mrs. Woods were not "claims" as defined by the WVCCPA. Id. at 4-5. According to RMS, its payment to a third party of the property charges constituted the "subject of the transaction," while its subsequent request for payment from Mrs.

15

Woods was mere reimbursement.  Id.  Mrs. Woods responds that both the principal and property charges were claims because those items were "obligation[s]," or at the very least "alleged obligation[s]," to pay RMS.  Id. at 16.

The court is not persuaded to adopt RMS' construction of "claim," in part because it fails to address its attempt to collect the entire principal amount of the reverse mortgage. After a series of failed attempts to recoup the property charges, on August 1, 2016, RMS provided Mrs. Woods 30 days' notice that she must pay the principal amount or face foreclosure.  Compl. ¶¶ 54, 59, 64-67.  The principal amount cannot be classified as anything but a "claim" as defined by the WVCCPA.  It was the primary obligation that Mrs. Woods owed to RMS under the reverse mortgage agreement, which doubtlessly was the subject of the transaction.

Looking beyond the principal to the property charges, the Supreme Court of Appeals of West Virginia has confronted a WVCCPA issue similar to the one faced here: whether, when a debt collector and consumer contract for indebtedness, and as part of servicing that contract the debt collector is forced to satisfy an obligation owed by the consumer to a third party, the debt collector's subsequent efforts to recoup its costs from the consumer as provided by the contract qualifies as a "claim"

under the debt collection provisions of the WVCCPA.  In <u>Dan's</u>
<u>Carworld, LLC v. Serian</u>, the Supreme Court of Appeals held that

> [w]hen a consumer purchases a motor vehicle from a
> dealership, and the dealership accepts the trade in of
> another motor vehicle as payment, or partial payment,
> of the purchase price of the vehicle being purchased,
> subsequent efforts by the dealership to collect from
> the consumer any amounts due the dealership by virtue
> of the dealership's payment of the loan secured by the
> trade-in vehicle must comply with the West Virginia
> Consumer Credit and Protection Act, codified in
> Chapter 46A of the West Virginia Code.

Syl. Pt. 8, 223 W. Va. 478, 480 (2009).

The court does not see any material difference between
the payments RMS sought to collect here and the facts confronted
by the Supreme Court of Appeals in <u>Dan's Carworld</u>.  In that
case, a consumer purchased a new vehicle from a debt collector,
trading in an older vehicle as partial payment.  <u>Id.</u>  As part of
the purchase agreement, the debt collector agreed to pay the
remaining balance on the trade-in vehicle that the consumer owed
to a third party.  <u>Id.</u>  Due to an apparent clerical error, the
amount owed on the trade-in vehicle was greater than the parties
agreed, and the debt collector sought to recover the difference
from the consumer pursuant to their agreement.  <u>Id.</u> at 481.

Just as RMS does in the present case, the debt
collector in <u>Dan's Carworld</u> argued that the payment it sought
from the consumer was not the subject of the relevant
transaction.  <u>Id.</u> at 484.  "[R]ather," according to the debt

collector, "it was seeking reimbursement of amounts it paid on behalf of [the consumer] to satisfy the lien on the [trade-in vehicle] sold by him to [the debt collector]." <u>Id.</u> The Supreme Court of Appeals disagreed, holding that the "[trade-in vehicle was] an inextricable part of the purchase of the vehicle for which it was traded, i.e. the transaction for the purchase of the [new vehicle]." <u>Id.</u> at 485. Specifically, the court found persuasive that "the contractual document giving rise to [the consumer's] obligation to pay to [the debt collector] the amount remaining due on the loan for his . . . trade-in vehicle was the motor vehicle purchase agreement for the [new vehicle]." <u>Id.</u>

In the present case, the Mortgage Loan Agreement ("Loan Agreement") provides that "[i]f [Mrs. Woods] fails to pay the property charges in a timely manner, . . . [RMS] shall pay the property charges." Exh. B, ¶ 2.10.5.[1] This provision is then referenced in both the Fixed Rate Note ("Note"), Exh. C, ¶

---

[1] Mrs. Woods asks the court to strike the reverse mortgage documents attached by RMS to the motion to dismiss. Resp. at 9. First, Mrs. Woods argues that she did not incorporate them into her complaint, <u>id.</u>, although she references the documents in paragraphs 68 and 84, Compl. ¶¶ 68, 84. Second, Mrs. Woods claims that the documents are "unverified," Resp. at 9, but the court notes that Mrs. Woods signed each one and initialed every page, <u>see</u> Exhs. A to D. The court finds that referencing the documents is integral to understanding the complaint, and the court finds no reason to question their authenticity. <u>See</u> <u>Occupy Columbia</u>, 738 F.3d at 116. Accordingly, the court has taken the documents into consideration.

2, and the Deed of Trust ("Security Instrument"), Exh. D, ¶ 2.
Just like in Dan's Carworld, Mrs. Woods' obligation to pay RMS
the property charges arose out the contract that created the
reverse mortgage.  Consequently, the property charges paid by
RMS are "inextricabl[y] part of the [reverse mortgage]." Dan's
Carworld, 223 W. Va. at 485.  For these reasons, the court finds
that the principal and tax and insurance charges are "claims" as
defined by the WVCCPA, and RMS' motion for judgment of Counts II
and III on the pleadings must be denied.


B. Count IV — Violations of the WVCCPA, the Residential Mortgage
      Act, and the Reverse Mortgage Act


         In Count IV, Mrs. Woods alleges that, at closing, RMS
"imposed and collected fees and charges not permitted, or in
excess of those permitted by," the WVCCPA, § 46A-3-107; the
Residential Mortgage Act, § 31-17-8(c); and the Reverse Mortgage
Act, §§ 47-24-1 et seq.  Compl. ¶ 79.  As an initial matter, RMS
points out that § 46A-3-107 is inapplicable here because it
applies to refinancing.  Mem. in Supp. at 9-10.  In addition,
RMS correctly notes that the Reverse Mortgage Act lacks a
private cause of action.  Reply at 6-7.  For these reasons, Mrs.

Woods' claims under § 46A-3-107 and the Reverse Mortgage Act
must be dismissed.[2]

Next, RMS claims that Count IV is time-barred. Mem.
in Supp. at 7-8. The Supreme Court of Appeals of West Virginia
instructs that "[a] five-step analysis should be applied to
determine whether a cause of action is time-barred." Syl. Pt.
5, Dunn v. Rockwell, 225 W. Va. 43, 46 (2009).

> First, the court should identify the applicable
> statute of limitation for each cause of action.
> Second, the court (or, if questions of material fact
> exist, the jury) should identify when the requisite
> elements of the cause of action occurred. Third, the
> discovery rule should be applied to determine when the
> statute of limitation began to run by determining when
> the plaintiff knew, or by the exercise of reasonable
> diligence should have known, of the elements of a
> possible cause of action . . . . Fourth, if the
> plaintiff is not entitled to the benefit of the
> discovery rule, then determine whether the defendant
> fraudulently concealed facts that prevented the
> plaintiff from discovering or pursuing the cause of
> action. Whenever a plaintiff is able to show that the
> defendant fraudulently concealed facts which prevented
> the plaintiff from discovering or pursuing the
> potential cause of action, the statute of limitation
> is tolled. And fifth, the court or the jury should
> determine if the statute of limitation period was
> arrested by some other tolling doctrine. Only the
> first step is purely a question of law; the resolution

---

[2] Mrs. Woods concedes that § 46A-3-107 applies to refinancing,
claims that the reference to the section was a "typo," and asks
the court to infer that she intended to bring a claim under §
46A-3-109. Resp. at 26 n.11. The proper vehicle to correct
mistakes in a complaint is by amendment. The Residential
Mortgage Act, § 31-17-8(c), however, incorporates § 46A-3-109 by
reference. Thus, despite Mrs. Woods' failure to amend her
complaint, § 46A-3-109 is nonetheless incorporated into Count
IV.

of steps two through five will generally involve
questions of material fact that will need to be
resolved by the trier of fact.

Id. (internal citation omitted).

West Virginia Code § 55-2-6 provides the limitations
period for contract actions:

> Every action to recover money . . . on any contract
> other than a judgment or recognizance[] shall be
> brought within the following number of years next
> after the right to bring the same shall have accrued,
> that is to say: If the case . . . be upon an award, or
> upon a contract in writing, signed by the party to be
> charged thereby, or by his agent, but not under seal,
> within ten years . . . .

(2016). § 55-2-12 provides a catch-all for actions with no
specifically applicable limitations period:

> Every personal action for which no limitation is
> otherwise prescribed shall be brought . . . within two
> years next after the right to bring the same shall
> have accrued if it be for damages for personal
> injuries . . . .

Id.

1.

With respect to the first step of the Dunn analysis,
RMS argues that the general, two-year statute of limitations
under § 55-2-12 applies to claims brought under the Residential
Mortgage Act. Mem. in Supp. at 7-8. Mrs. Woods responds that
an action under § 31-17-8(c) should fall under the ten-year

statute of limitations for contract actions found in § 55-2-6.
Resp. at 18-19.

The Supreme Court of Appeals has not directly ruled on whether an action under the Residential Mortgage Act is ex contractu or ex delicto, but it has provided instruction on the issue. In <u>Hall v. Nichols</u>, the Supreme Court of Appeals stated that

> [w]here the act complained of in a legal malpractice
> action is a breach of specific terms of the contract
> without reference to the legal duties imposed by law
> on the attorney/client relationship, the action is
> contractual in nature. Where the essential claim of
> the action is a breach of duty imposed by law on the
> attorney/client relationship and not of the contract
> itself, the action lies in tort.

Syl. Pt. 2, 184 W. Va. 466, 467, 469 (1990) (citing Syl. Pt. 1, <u>Pancake House, Inc. v. Redmond</u>, 239 Kan. 83, 83 (1986)). Although in the specific context of legal malpractice, <u>Hall</u> has been relied upon by other courts to determine the statute of limitations applicable to other actions. See <u>Kenney v. Indep. Order of Foresters</u>, 744 F.3d 901, 906-07 (4th Cir. 2014) (West Virginia Unfair Trade Practices Act); <u>Robinson v. Quicken Loans, Inc.</u>, 988 F. Supp. 2d 615, 627 (S.D. W. Va. 2013) (Chambers, J.) (Residential Mortgage Act). Further, the Supreme Court of Appeals has followed the same track of reasoning in other contexts as well. See <u>Wilt v. State Auto. Mut. Ins. Co.</u>, 203 W. Va. 165, 166-67 (1998) (West Virginia Unfair Trade Practices

Act); Shanholtz v. Monongahela Power Co., 165 W. Va. 305, 310

(1980) (breach of at-will employment contract); Homes v.

Monongahela Power Co., 136 W. Va. 877 (1952) (whether the

complaint brought an action for the tort of trespass or for

breach of the underlying contract); see also Western v. Buffalo

Mining Co., 162 W. Va. 543, 548-49 (1979) (Neely, J.,

dissenting).

    In addition, the Supreme Court of Appeals tempers its

nature-of-the-action analysis with the following condition:

> A complaint that could be construed as being either in
> tort or on contract will be presumed to be on contract
> whenever the action would be barred by the statute of
> limitations if construed as being in tort.

Syl Pt. 1, Fuller v. Riffe, 209 W. Va. 209, 210 (2001) (citation

omitted). The effect of this statement is not to construe any

action as one in contract where it would otherwise be time-

barred as a tort. Rather, only when "the facts [are] such that

it [is] consistent with reason to conclude that the complaint

sound[s] in contract" should the ten-year statute of limitations

under § 55-2-6 be applied. Shanholtz, 165 W. Va. at 310.

    Two courts have considered this issue, and both

concluded that an action under the Residential Mortgage Act

sounds in tort. See Robinson, 988 F. Supp. 2d at 627; Litten v.

Quicken Loans, Inc., 13-cv-00192, 2013 WL 6001256, at *8 (N.D.

W. Va. Nov. 12, 2013) (Keeley, J.). The court sees no reason to

23

disagree in light of the facts here.  Pertinent to Count IV,

Mrs. Woods alleges that USA, which transferred the reverse

mortgage to RMS after closing, "knowingly contracted for and/or

collected numerous illegal charges in violation of law."  Compl.

¶ 40.  Similarly, she claims that "Defendants willfully imposed

. . . fees not permitted, or in excess of those permitted, by"

West Virginia law, including the Residential Mortgage Act.  Id.

¶ 79.

Like Hall, "[n]otwithstanding the inclusion of the

term 'contract[ed]'" and references to the reverse mortgage

contract, "the essence of [Mrs. Woods'] cause of action is

various breaches of duties implied by law and not by contract."

184 W. Va. at 469.  Namely, the conduct complained of in Count

IV is RMS' execution of the contract by its very terms –

including its imposition of allegedly illegal fees in breach of

duty under the Residential Mortgage Act.  Cf. Homes, 136 W. Va.

at 884 (citation omitted) ("Where the transaction complained of

had its origin in a contract which places the parties in such a

relation that in attempting to perform the promised service the

tort was committed, the breach of contract is not the gravamen

of the action.  The contract in such case is mere inducement,

creating the state of things which furnishes the occasion of the

tort, and in all such cases the remedy is an action Ex delicto, and not an action Ex contractu.").

In addition, the civil remedy section of the Residential Mortgage Act, § 31-17-17, permits the cancellation of a "mortgage loan . . . made in willful violation" of the Act. Similarly, Mrs. Woods alleges that RMS "willfully" and "knowingly" charged illegal fees. Compl. ¶¶ 40, 79. This choice of verbiage — "knowingly" and "willingly" - supports the tortious nature of the allegations under Count IV. See 22 Am. Jur. 2d Damages § 93 (2017) ("The goal in contract law is not to punish the breaching party but to make the nonbreaching party whole. Therefore, the motives of the defendant in breaking a contract are immaterial and cannot be inquired into on the question of compensatory damages.") (footnotes omitted). Accordingly, the court finds that Count IV is ex delicto and subject to the two-year statute of limitations described in West Virginia Code § 55-2-12.

2.

Resolving which statute of limitations applies to the present action does not dispose of the matter. The court must proceed to the second step of the analysis delineated in Dunn: "the court (or, if questions of material fact exist, the jury)

should identify when the requisite elements of the cause of action occurred." Id.  As there are not questions of material fact here, the court finds that Mrs. Woods' cause of action accrued on the date of closing, July 14, 2012.

Mrs. Woods argues that her injury did not occur at closing.  Resp. at 19-20.  Instead, she asserts that her injury has not yet occurred because the principal, which includes the allegedly illegal charges, "will not be due and owing[] until Mrs. Woods dies or sells her home."  Id.   Alternatively, Mrs. Woods claims that the allegedly illegal charges constitute a continuing injury.  Id. at 20.

The general rule in West Virginia is that "a cause of action accrues . . . when a tort occurs."  Syl. Pt. 2, Gaither v. City Hosp., Inc., 199 W. Va. 706, 708 (1997) (citation omitted); 51 Am. Jur. 2d Limitation of Actions § 146 (2017) ("A tort claim accrues for limitations purposes when it becomes enforceable, that is, when all elements of the tort can be truthfully alleged in a complaint . . . .").  An exception to the rule arises in the case of a continuing tort, which "requires a showing of repetitious, wrongful conduct." Ricottilli v. Summersville Mem. Hosp., 188 W. Va. 674, 677 (1992) (citation omitted).  In such a case, the cause of action accrues, and the statute of limitation resets, each time the

wrongful act re-occurs.  See id. at 677-78.  Notably, "a

wrongful act with consequential continuing damages is not a

continuing tort."  Id. at 677 (citation omitted).

The Supreme Court of Appeals of West Virginia has not

addressed at what point a cause of action under the Residential

Mortgage Act accrues, but each court to have considered the

issue has concluded that the action accrues at the time the

allegedly illegal fees are imposed – i.e., at closing.  See

Lavis v. Reverse Mortgage Solutions, LLC, 17-cv-00209, 2017 WL

2531580, at *3-4 (S.D. W. Va. June 9, 2017) (Berger, J.); In re

Shaver, 10-813, 2014 WL 3057951, at *2 (Bankr. N.D. W. Va. June

26, 2014); Robinson, 988 F. Supp. 2d at 627-28 (Chambers, J.);

Fluharty v. Quicken Loans, Inc., 13-cv-00068, 2013 WL 5963060,

at *3 (N.D. W. Va. Nov. 7, 2013) aff'd, 623 Fed. App'x 65 (4th

Cir. 2015).  The Residential Mortgage Act bolsters these

holdings in that it indicates that suit may be brought when an

unlawful "loan is made," rather than waiting until all of the

illegal fees are paid.  See § 31-17-17(a) ("If any primary or

subordinate mortgage loan is made in willful violation of the

provisions of this article, . . . such loan may be cancelled by

a court of competent jurisdiction."); see also id. § 31-17-17(c)

("Any residential mortgage loan transaction in violation of this

article shall be subject to an action . . . by the borrower . .
. .").

Further, there is no "repetitious . . . conduct" by
RMS in connection with the allegedly illegal fees.  Id.
Although included in the principal, those fees were imposed at
the closing.  Compl. ¶¶ 36, 40.  There were no other instances
of wrongful conduct by RMS in connection with the closing fees,
and RMS certainly did not repeat any such conduct.  As
instructed by Ricottelli, the fact that interest
"consequential[ly] continu[es]" to accrue does not re-
characterize Count IV as a continuing tort.

On a similar note, Mrs. Woods also claims that the
Residential Mortgage Act "is at base another West Virginia usury
statute," Resp. at 22, an action which the Supreme Court of
Appeals holds does not accrue until all of the interest has been
paid or becomes due.  See Snodgrass v. Sisson's Mobile Home
Sales, Inc., 161 W. Va. 588, 597 (1978); §§ 46-6-1 et seq.
Comparing the Reverse Mortgage Act with the usury statute, Mrs.
Woods insists that "it is obvious" "how the Supreme Court of
Appeals [would] rule" if confronted with this issue.  Resp. at
25.

The court is not persuaded to extend Snodgrass to the
present case.  In Snodgrass, the Supreme Court of Appeals'

holding involved a thorough review of the usury statute, including its policy objectives and the West Virginia Legislature's intent in passing the statute. See 161 W. Va. at 596-97. The findings announced were specific to usury, and without guidance on generally applicable principles from the Supreme Court of Appeals, the court is not prepared to stretch Snodgrass to cover the one-time closing fees imposed here.

3.

Last, Mrs. Woods contends that the statute of limitations, whichever applies, was tolled pursuant to the discovery rule as described in the third step of the Dunn analysis. Resp. at 25. RMS replies that Mrs. Woods was apprised of the allegedly illegal fees at the closing, noting that she initialed and signed the reverse mortgage contract. Reply at 10.

"[T]he discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action." Dunn, 225 W. Va. at 46. Mrs. Woods was present at the closing, Compl. ¶ 38, and she signed and initialed each of the mortgage documents that day, see Exhs. A to D. Accordingly, the

court sees no evidence that Mrs. Woods plausibly could not have, "by the exercise of reasonable diligence," known of the allegedly illegal fees at closing.

The parties have not presented arguments on the fourth and fifth steps in the Dunn analysis, and the facts do not show that either would impact the outcome here. For these reasons, RMS' motion for judgment of Count IV on the pleadings must be granted.

### C. Count VII — Breach of Contract

In Count VII, Mrs. Woods claims that RMS breached the terms of the reverse mortgage contract, "as well as its duty of good faith and fair dealing." Compl. ¶¶ 84-86. RMS argues that Mrs. Woods' breach of contract claim is entirely comprised of conclusory allegations and should be dismissed. Mem. in Supp. at 11.

"A claim for breach of contract requires [1] proof of the formation of a contract, [2] a breach of the terms of that contract, and [3] resulting damages." Sneberger v. Morrison, 235 W. Va. 654, 669 (2015) (citations omitted). Additionally, "[i]n every contract there is a covenant of good faith and fair dealing[;] [h]owever, . . . this covenant 'does not provide a

cause of action apart from a breach of contract claim.'" <u>Gaddy</u>
<u>Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP</u>, 231 W. Va.
577, 578 (2013) (quoting <u>Highmark W. Va., Inc. v. Jamie</u>, 221 W.
Va. 487, 492 (2007)).  In other words, "[t]he implied covenant
of good faith and fair dealing cannot give contracting parties
rights which are inconsistent with those set out in the
contract." <u>Evans v. United Bank, Inc.</u>, 235 W. Va. 619, 628
(2015) (alteration in original) (quoting <u>Barn-Chestnut, Inc. v.</u>
<u>CFM Dev. Corp.</u>, 193 W. Va. 565, 572 (1995)).

Evaluation of Count VII first requires review of the
reverse mortgage contract, found in the Loan Agreement, the
Note, and the Security Instrument.  <u>See</u> Exhs. B to D.

At any time, Mrs. Woods had the right to prepay the
debt owed under the contract.  Exh. C, ¶ 5.  The Security
Instrument provides the following in regards to acceleration of
the debt:

9. Grounds for Acceleration of Debt.

. . .

(b) Due and Payable with Secretary Approval.
Lender may require immediate payment-in-full of
all sums secured by this Security Instrument,
upon approval of the Secretary, if:

. . .

(iii) An obligation of the Borrower under
this Security Instrument is not performed.

(c) Notice to Lender.  Borrower shall notify
Lender whenever any of the events listed in this
Paragraph . . . (b) occur.

(d) Notice to Secretary and Borrower.  Lender
shall notify the Secretary and Borrower whenever
the loan becomes due and payable under Paragraph
9 . . . (b).  Lender shall not have the right to
commence foreclosure until Borrower has had 30
days after notice to either:

   (i) Correct the matter . . . or

   (ii) Pay the balance in full . . . .

Exh. D; see also Exh. C, ¶ 6 (same in regards to accelerating

the debt).  Upon acceleration of the debt, Mrs. Woods had the

right to reinstate by remedying her default.  Exh. C, ¶ 11.

   Pertinently, the Security Instrument imposed upon Mrs.

Woods the following obligation:

Borrower shall pay all property charges . . . in a
timely manner, . . . unless Lender pays property
charges . . . by charging such payments to a line of
credit as provided for in the Loan Agreement.

Exh. D, ¶ 2.  Correspondingly, the Loan Agreement provides that

[i]f Borrower fails to pay the property charges in a
timely manner, and has not elected to have Lender make
the payments, Lender shall pay the property charges as
a Loan Advance as required under Section 2.16.  If a
pattern of missed payments occurs, Lender may
establish procedures to pay the property charges from
Borrower's funds as if Borrower elected to have Lender
pay the property charges.

Exh. B, ¶ 2.10.5.  The Loan Agreement and the Security

Instrument make such advances under the Loan Agreement

mandatory.  See Exh. B, ¶ 4.5; Exh. D, ¶ 28.  Next, paragraph

2.16 of the Loan Agreement requires that

> Loan Advances made pursuant to Section[] . . . 2.10.5
> . . . shall be made from a line of credit under
> Section 2.6 or 2.7 to the extent possible.  If no line
> of credit sufficient to make the Loan Advances exists,
> any future monthly payments must be recalculated in
> accordance with Subsection 2.5.3 or 2.5.4 to create a
> line of credit sufficient to make the Loan Advance.

Exh. B.

The Payment Plan, attached to the Loan Agreement as

Exhibit 1, indicates that Mrs. Woods had no available line of

credit.  See Exh. B, Payment Plan.  Thus, paragraph 2.5.3 of the

Loan Agreement provides that

> Monthly payments under the term payment plan . . .
> shall be calculated so that the sum of [the principal
> balance] added to . . . (iv) . . . shall be equal to
> or less than the Principal Limit at the end of the
> term:
>
>      . . .
>
> (iv) All monthly payments due through the payment
> term, including funds withheld for payment of
> property charges under Section 2.10 . . . .

Id.

Mrs. Woods alleges that after she failed to make

timely tax and hazard insurance premium payments, "RMS force-

placed expensive hazard insurance on the home" and "demand[ed]

full and immediate payment of the . . . charges."  Compl. ¶¶ 52-

54.  Mrs. Woods "offered to make monthly payments" on the

outstanding charges, id. ¶ 56, but RMS replied that "it would only accept payment in full" and threatened foreclosure, id. ¶ 59. According to Mrs. Woods, RMS had a contractual duty to permit Mrs. Woods "to make full or partial pre-payment of sums claimed under her reverse mortgage," id. ¶ 58, and was obligated to consider Federal Housing Administration ("FHA") guidelines permitting payment plans, id. ¶¶ 45, 57.

Considering the facts in the light most favorable to Mrs. Woods and drawing all inferences in her favor, the court finds that she has failed to state a claim for breach of contract. Where a contract "expresses the intent of the parties in plain and unambiguous language," the contract "is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. Pt. 9, Arnold v. Palmer, 224 W. Va. 495, 497 (2009) (internal quotations omitted) (citations omitted).

First, Mrs. Woods argues that RMS' refusal of her offer to prepay, its failure to follow FHA guidelines and institute a payment plan, and its denial of the right to reinstate each constituted an alleged "breach[ of] express provisions of the contract" and of the "duty of good faith and fair dealing." Id. 86. Mrs. Woods' offer to enter into a payment plan was not, however, an offer to "prepay" – she had

already defaulted on the property charges. Nor can it be characterized as reinstatement since a payment plan by nature defers payment of the delinquent charges. In addition, RMS was not required to follow the FHA guidelines; it had the discretion to do so, just as it had the discretion to accelerate Mrs. Woods' debt upon her default. See Nahigian v. Juno-Loudoun, LLC, 677 F.3d 579, 587 (4th Cir. 2012) ("HUD guidelines are not regulations issued with the intent that they act as binding law.").

Second, Mrs. Woods argues on brief that RMS had a non-discretionary duty under the reverse mortgage contract to open a line of credit to which it must charge loan advances for the purpose of paying unpaid property charges, with the loan advances added to the principal balance payable according to the terms of the contract, i.e. upon Mrs. Woods' death or sale of the house. See Resp. at 30-32. Thus, Mrs. Woods contends that RMS breached the contract when it demanded payment after providing her advances on those charges. Id. at 30.

The "plain and unambiguous language" of the reverse mortgage contract provides as follows: in the event that Mrs. Woods failed to discharge one of her obligations under the reverse mortgage contract, RMS had the right to accelerate the debt upon approval from the Secretary of HUD. Exh. C, ¶

6(b)(iii).  One such obligation required Mrs. Woods to make timely payment of the property charges.  Exh. D, ¶ 2.  That obligation was, however, accompanied by the proviso that RMS may have been required to "charg[e] such payments to a line of credit."  Id.; see also Exh. B, ¶ 2.10.5.  If no line of credit from which RMS could have made the payments was available (and none was available), RMS was required to institute a periodic payment plan by which the property charges would have been added to the principal amount, so long as "the sum of [the payments and the principal] shall be equal to or less than the Principal Limit."  Exh. B, ¶ 2.5.3.  The problem for Mrs. Woods is that the principal amount and the principal limit are equal in value.  See id., Payment Plan.  Thus, because there was no room to add a payment plan, RMS was under no contractual duty to open a line of credit for the purpose of advancing Mrs. Woods' unpaid property charges.

Third, Mrs. Woods insists on brief that, in the event that she did fail to discharge her obligations under the contract, RMS breached the contract by demanding payment of the property charges and of the principal before it accelerated the debt on September 1, 2016.  Resp. at 32.  Contrary to Mrs. Woods' assertion, upon her breach RMS had discretion to "do and pay whatever is necessary to protect the value of the Property

and Lender's rights in the property," Exh. D, ¶ 5, which certainly includes ensuring that the property charges have been paid. In addition, RMS had a contractual duty to give Mrs. Woods 30 days' warning that failure to pay the outstanding charges would result in foreclosure. See Exh. C, ¶ 9(c)-(d).

Last, Mrs. Woods states that "there is a question of fact as to whether RMS ever sought or obtained . . . authorization of acceleration [of the debt] from the Secretary of HUD" as required by the contract. Resp. at 32. There are, however, no statements in the complaint to that effect, and the court cannot draw inferences on facts that have not been alleged.

Because Mrs. Woods has not identified a breach of the reverse mortgage contract, there can be no corresponding breach of the implied covenant of good faith and fair dealing. For these reasons, RMS' motion for judgment of Count VII on the pleadings must be granted.

IV. Conclusion

For the reasons stated above, the court ORDERS as follows:

1. RMS' motion for judgment of Counts II and III on the pleadings be, and hereby is, denied;

2. RMS' motion for judgment of Count IV on the pleadings be, and hereby is, granted; and

3. RMS' motion for judgment of Count VII on the pleadings be, and hereby is, granted.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: September 29, 2017

John T. Copenhaver, Jr.
United States District Judge